As we understand it, the matter under consideration is a motion to stay the district court's alternative to reverse his order. Am I, are we correct about that? That's correct. All right, good. Mr. Vannitali. You ready to proceed? Good. Good morning. My name is Theodore Vannitali. I'm an assistant attorney general for the state of New Jersey. I'm here on behalf of the individual defendants who are named in their, their official capacities. Before I get too far along, I would like to introduce my colleagues. I'm here with Senior Deputy Attorney General Larry Etzweiler and Deputy Attorney General Jason Postelnik and working with me on this matter. One of the things, go ahead, one of the things is that the test here is, is what? The test is, this is a, for a preliminary injunction. Well, the test for preliminary injunction is the standard four prime, four prime test. And the first one is reasonable probability of success. Likelihood of success and merits, that's correct. And so that doesn't mean they have to show greater than 50% at the P.I. stage, do they? Well, I think that they have to demonstrate that they're likely, reasonably likely. Well, likelihood means probability, probably, I mean, we often use the word incorrectly. I mean, at this stage, certainly at the permanent injunction stage, there's no doubt about it. They have to show that they can win. But at this stage, the P.I. stage, all they have to show is reasonable likelihood that they have a chance, a good chance of winning. But it isn't greater than 50%, is it? Well, I, as to pin it down to a specific percentage, Your Honor, I think it's a difficult thing to do. They've got to, they have to be persuasive that they're going to win, in my judgment, and they have not done that. And as I regard the standard of review here, which, you know, it really is the standard, just recently articulated, by the Court on Friday, in the Brown v. City of Pittsburgh case, and I would like to, even though we didn't get a chance to cite it in our brief, because it came down to 10, and we came, although we filed our brief at 1, I did, you know, provide copies to the references. I think we know, we know. Yeah, I think we got an idea on that. But what I'm saying here is, if this is a close case, even if they lose on the merits, don't they still have a good chance, don't they get, don't, and you add in the other three factors, which we'll talk about them later on, don't they get the API? Well, under the Court's standard of review, as articulated in the Brown case, what the Court does is it looks at whether there are factual errors that were made, that underlie the assumptions, which we believe is the case, and whether, and the Court does review de novo, the legal conclusions reached by the Court in the course of mandating the preliminary injunction. And I think there are very clear errors. Yeah, I'm not saying that you may not, in the context of a constitutional challenge here, may not to some extent delve into the merits. What I'm asking you now is, they don't have to prove that they will win on the first prong. That they absolutely will win, I would agree with you on that. They have to prove reasonable likelihood of success, which I don't think has been demonstrated in this case. Let's go to the end of the analysis, because that's perhaps easier. On the balancing the harm to both sides, would you agree that at this stage, that after 20 years of practice, and at least so far as we know, no demonstrable abuse, that on the weighing of the harms and the matter of irreparable harm to the media, in this case, falls on their side? Well, Your Honor, I mean, our position is that they never proved irreparable harm. That, you know, the Court below infected its consideration of that issue with a factual error, which is one of our, you know, basic concerns. The plaintiff has never taken the position that it is impossible or totally impractical to do exit polling from 101 feet. And the showing they made below, which was this conflating of association with cause and effect, doesn't get the job done. I mean, I would concede that they may need more than a single exit pollster at the polling locations. And they may have to train their people a little better. But there's absolutely no demonstration, respectfully. Well, what they had before the District Court, at least according to the District Court, is that Lenski claimed that if you have 100 feet or more than 100 feet, you can't, sometimes you miss particular voters, you can't find them because they meld into the crowd. And so they can't identify them. And they also said in 16 of the 40 polling places that it was determined it would be impossible to find a reasonable location within 100 feet. But remember, that was on the premise of a single pollster at each location. That is the assumption from which Lenski proceeded. And it seems, frankly, self-evident to me that if they stationed more than one, they could quadrant the area around the polling place and perform exactly the same function of doing intercepts on a statistically reliable basis and get the same results. And if you look at the, you know, we did attach to Dr. Hempstead's declaration, this report from the 2004 election, we did this exhaustive analysis of, you know, the problem that befell exit polling during the Kerry-Bush election in 2004. You have a host of problems that affect exit polling. I mean, it's, you know, the issue of distance from the poll is just one. But there's interesting notations in the report about in the cases of Minnesota and South Dakota, where they anticipated the distance issue, they found that by training their people, they could significantly diminish the effect of the problem. Mr. Van Etley, Mr. Van Etley, I think one of the, getting back to Judge Sirica's question, I'd like to know what, assuming that the exit polling were allowed, what harm is going to come to the state of New Jersey from this small amount of interference at a limited number of polling places across the state tomorrow? Try to stay on the, close to the mic. Yes, I'm sorry. Yeah, I think at this point, now we did anticipate in the wake of the judge's ruling that there might be efforts by other groups to, you know, come in and to take advantage of, you know, the combination of what the Supreme Court of New Jersey said and what the judge ruled below. That hasn't happened. So I think at this point, as a practical matter, what we are talking about is an issue of comedy. You know, we have got a declaration by the highest court in the state of New Jersey. So you're not making a floodgates argument? There is a fundamental floodgates argument that's at the root of what our concern is. But I can't suggest to you that the floodgates are going to open between today and they'd close the polling tomorrow as a practical matter. I can't do that. Well, that, yeah, that was the thrust of my question and then Judge Fischer pinpointed it. We're dealing with a preliminary injunction that affects the election tomorrow. And presumably there's going to be a further hearing on this matter. Doesn't have to be, obviously, but presumably there will. Well, yeah, clearly the preliminary injunction gets mooted if it's not, if that issue is not dealt with before tomorrow. But the, I mean, for example, the, you know, the media may be able to pick 40 in the next election. The media may be able to pick 40 other places that are more suitable for the 100-foot restriction. Or they may have three or four pollsters, as you've indicated, instead of one pollster. I mean, there are ways to handle it. On the other hand, I understand your position on this as well. I'm sorry. Do we have to, what I'm getting at is do we have to decide definitively the narrow tailoring issue today? Well, I do think you have an absolute opportunity to do so. I think that.  You're right. Again, I'm not going to suggest to you that there's going to be chaos at the polls tomorrow if you don't decide this case. I can't, I don't have a basis to suggest that. But I would go back to the fundamental proposition that is sought to be vindicated by the New Jersey Supreme Court and obviously by the Attorney General's Office, which is, you know, you can't make these distinctions between exit polling done by news media and exit polling done by public interest groups and nonpartisan groups. I mean, that's fundamentally the case. And I do, I think it's clear, and I think Brown helps, you know, nail this, that what the judge did below in addressing, in requiring New Jersey to demonstrate, you know, harm from these particular plaintiffs given their national reputation and given their limited intrusion, that's not the test. I mean, that clearly is not the analysis. That's clear under the Heffron case, that's clear under Warden, that's crystal clear under the Brown case you just decided. The issue is not these particular plaintiffs. The issue is the fundamental problem that the statute seeks to deal with. And that issue is, you know, it's not about, you know, these nationally reputable journalistic organizations. It is about, you know, bringing people into the polling place in such a way that you get confusion, hustle and bustle. You get the possibility of discouraging people from exercising the fundamental right to vote. And that, we believe. Well, how are they in any way obstructed from voting? I mean, this is, we're talking about exit polling. This is after they vote and a certain number are picked out, one out of X voters coming out, and they ask them, say, can we ask you some questions? We're doing some exit polling. And they can say yes or no. Well, again, that's the wrong focus, with respect, Your Honor, because it's not about these plaintiffs. It really isn't. I mean, that's what was said in the Brown case. It's not about the individual plaintiff. It is about the interest that the legislature is seeking to protect here. And that is the much more. Well, the interest they're seeking to protect is electioneering, that is solicitation of votes and handing out or displaying of campaign materials. And that's not what's going on here. Well, that's the interest that is sought to be protected. This is where we're fundamentally different from where it was. I'm just looking at one of the statutes. If a person on election day tamper, deface, interfere with any polling booth or obstruct the entrance to any polling place or obstruct or interfere with any voter or loiter in or near the polling place or with the purpose to obstruct or interfere, to unduly delay other voters from voting, spend an inordinate amount of time in the polling booth or do any electioneering with any polling place or within 100 feet. What the Supreme Court of New Jersey said the purpose of these statutes was was to provide a broad protective zone, the last 100 feet, so that voters can come into that space without interference. And we're really talking about physical interference, without the hurly-burly of people being in that space. Electioneering, I mean, I think when you go back to Burson, what the legitimate state interest here is not last minute electioneering. I mean, that's crystal clear from the Mills v. Alabama case, you know, where the Supreme Court struck down a law against putting out editorials on the day of an election. It's not about the last minute delivery of the message. It's about people in the way. It's about so voters don't have to run a gauntlet to vote of people soliciting their vote one way or the other. Exactly. Well, a gauntlet of people without regard to whether they're handing out literature, they're delivering messages. But is there any evidence that the news organizations here are part of if they were allowed in, you'd have to go through a gauntlet? First of all, they're not even going to touch you going in. They're not going to say anything. Well, again, this is where I think we divide company because, you know, we agreed with the Supreme Court of New Jersey said that by force of logic, you cannot exclude, you cannot allow access to exit pollsters, okay, and then exclude other groups. No question it makes it much more difficult for the state of New Jersey to enforce what are very legitimate interests in protecting intimidation, harassment, and so forth and so on. And as I read the media submissions, it doesn't appear that they're asking for any special consideration for themselves as opposed to non-media folks that might want to do exit polling. My question is, why isn't it permissible to distinguish between exit polling and other forms of communication? And as Judge Ambrose has alluded to, you've got 20 years of history where there doesn't seem to be any abuse  presented any evidence that it was a problem. Now, New Jersey Supreme Court, of course, did not want to make that distinction between exit polling and other matters. But I'd like your opinion on the Burson case, which said that failure to regulate all speech doesn't render a statute fatally under-inclusive. The First Amendment does not require states to regulate for problems that do not exist. How do we take that in this context? Well, yeah. I mean, in the Burson case, that Tennessee statute did specifically exclude exit pollsters. So exit pollsters were allowed within that 100-foot protected zone. And that was the statute on that basis was subject to an under-inclusiveness challenge. And what the court said was that the state could legitimately make a choice with respect to, you know, what kinds of parties entered into that 100-foot zone. And that would not, you know, render the statute invalid. I don't think that says anything about what the court's view would have been had there been a broad prophylactic rule that didn't allow anybody within that 100-foot zone, which is exactly the situation we have here. And if you look at, you know, Stephen's dissent, you know, he skewered the plurality on that point by pointing out that the concern raised by exit polling is precisely the same character of concern that is raised by the kinds of people that come into the space to do electioneering. Again, it's not the message, it's their presence in that zone. So... But couldn't you, I mean, have you, do you meet the narrow tailoring test by the complete ban? Yes. I mean, again, if you define the state's interest correctly, and obviously we disagree with how narrowly it was framed by the court below, but if you define it correctly, which is to provide this, you know, freedom of access to the polling place so that when you get there, it's not a problem and you're, you know, in effect invited in, you're not, again, the gauntlet isn't there. Then in the face of that, of that broad purpose, given the fundamental interest in the right to vote, then, yeah, we say that it is appropriately tailored to that purpose. And again, as, you know, as you would get it in Brown, it doesn't have to be the least intrusive means. And like the Hill case, I mean, there is an advantage to, we say, to a clear, bright line, prophylactic rule. They say they don't have adequate alternatives. Yeah. And we disagree with the factual proposition there. I mean, I, if I can, if I can, you know, move up a level, Your Honor, I think there's a question, and I just, we don't depend upon this for the review of the case, but I think there's a question whether we have, the State of New Jersey has to provide an adequate alternative to an intrusive methodology of collecting data. I mean, it's not classic speech, right? So, but even if we did, yeah, we say that there's no evidence that 101 feet, you can't get the job done, and that they have not demonstrated the contrary. All right, good. And Judge Fischer, any questions? I don't. No, I haven't. Good. Thank you very much, Mr. Vann, Italy. Ms. Buckley. Thank you, Chief Judge Sirica. Good morning. Good morning. It's Susan Buckley on behalf of the appellees, the six news organization plaintiffs below. Excuse me, Your Honor. With me today is Kevin McKenna and Alvin Estoviz of the Gibbons firm and my colleague Kayvon Sadeghi of Cahill Gordon. Your Honor, to turn to some of the issues that you addressed with Mr. Vann, Italy, let's start with the harm. I don't even know how the State can even urge that there is any harm tomorrow, and I seem to hear that they're now deciding that there might not be, but given the 20 years' experience in New Jersey and the Attorney General's admissions in her briefs about how the exit polling has been peacefully and unobtrusively conducted and does not interfere in any way, I just don't think they can. Ms. Buckley, let me ask you this question. Let's assume that we continue the preliminary injunction, which will allow you to do exit polling tomorrow, and this afternoon into our courtroom came Governor Corzine and his election committee, and they said since there's exit polling that can be done at 100 feet, I want to be there too because I'm the governor of New Jersey and I'm running for reelection, and I want to ask the people as they're leaving how they voted and why they voted and who they were because I think I have a right to have that data. Why would Governor Corzine's interests be any different than yours? Well, first of all, Governor Corzine hasn't come in on the elections tomorrow, but passing that, Judge Fischer, his interests are a little bit different from ours because the fact that these are journalistic organizations is not irrelevant here. I mean, the information they gather— Do you have greater rights than the governor as both a voter, a citizen of the state of New Jersey, and a candidate on the ballot? Well, certainly journalistic organizations have been held by the Supreme Court to be a surrogate for the public. They have been given a recognition of their role in gathering news and disseminating it to the public. Brandsburg tells us that the right to gather news is meaningless unless you can gather it. But on the Governor Corzine example, he would have to make a similar kind of showing that I think we made, which is why he can't do what he needs to do within the 100-foot zone. I don't know what kind of evidence he would put forward. He could certainly use the question of reliability as voters got 101-plus feet away, could he not, and use the same kind of data that you did. I would assume he could if he had that. And if he could make the kinds of evidentiary showings that we made in a situation where it is not even our burden of proof, I think then he has a right to come to federal court and make that claim and see if there would be relief granted to him. Well, that doesn't quite answer Judge Fischer's question. Let's assume the ACLU or other public interest groups wanted to do the exit polling. It seems to me that it's clear that if we allow the media to breach the 100-foot barrier, that at least we have to allow any other entity to do the same thing, at least for the purpose of exit polling and maybe beyond that, maybe for other forms of communication. Well, Judge Sarek, I think you'd have to take each case as it comes. Certainly if there are others with First Amendment rights who want to pursue them, they can, and they can come and try to assert a claim under 1983. I mean, we do have a number of years' experience here. There have been 12 litigations brought against various states across the country by these particular plaintiffs beginning in the 80s, continuing through last year, and we have never had a situation where after the case ended or after their plenary injunction, there was some rush of many other groups to try to inject themselves in a polling place in an inappropriate way. That's a good— Ms. Buckley, isn't this case in a little different posture, however, in light of the fact that the New Jersey Supreme Court within the last month just found this statute that you're here on now and others could be here on this afternoon, that the New Jersey Supreme Court just found this statute facially constitutional, doesn't that put this statute in a little different posture than practically any other challenge that this court or another court would face? It certainly does, Judge Fischer. There's never been in any of the cases before a ruling by the state's highest court in such a temporally brief period, which takes a different view than we are, we admit, asking the federal courts to take. I think we would all agree. I think even my colleague, Mr. Van Italy, would agree that this court, and certainly the district court, is not bound by the New Jersey Supreme Court's determination of federal constitutional law, which quite frankly we disagree with and we think was formulated on a record that was inadequate as to what exit polling is, how it does, and how certainly it's unintrusive, and that that might have made a difference if that kind of a record would have been there. But certainly, yes, it is unique in that sense, Judge Fischer. The questions we're asking you, and you're giving, I was going to say, good general responses, you know, case-by-case basis, but if we do it here, there could theoretically be hundreds more that would say, okay, I want the same exception for exit polling because the statute really isn't meant to apply to me. What kind of test would you suggest that a court consider in dealing with the merits, if we were? Well, I think we'd have to go back, Your Honor, to the traditional test that governs in this particular case and this particular area. The plaintiffs have urged that it is an intermediate, I'm sorry, the appellants have urged that it's an intermediate scrutiny test. I think there can be some debate about that, but I don't think in the end that it matters. That even under the intermediate scrutiny test, which this court is far familiar with as of Friday, certainly as reflected in the Brown decision of Friday, the state cannot meet that test because it cannot meet the narrow tailoring prong. I mean, let's just think about the Brown case for a moment. I mean, there in a case where you have a woman's right to exercise her right to abortion and the privacy concerns that go into making that decision, we had an enormously lengthy and detailed opinion dissecting 8-foot and 15-foot zones around abortion clinics. And in those cases, as we know from Schenck, a 15-foot zone around a woman going into an abortion clinic was unconstitutional. Friday, this court examined the 8-foot part of the bubble zone and the 15-foot part of the buffer zone, I think you called it, and made very careful weighing considerations that look to can the plaintiff, can the protesters there at least have a shot to get their message to be heard, to have their ideas communicated. And that was your concern in looking at the narrow tailoring. I don't see how that isn't almost dispositive of the issues here on narrow tailoring. We have uncontradicted evidence in the record. Mr. VanItaly is simply mistaken about that. From Mr. Lenski, based on three factors, one, his 20 years of experience, two, studies after the 2004 and 2006 election that said that exit polling was severely compromised by 100-foot restrictions, and three, his individualized look at the 40 polling places that they just happened to pre-select this year to demonstrate that they cannot communicate in this particular way. And when you balance that against the harm, I should say the lack of harm, the conceded lack of harm by the state in terms of interference, in terms of integrity of the election, in terms of obstruction, there is just nothing there that 20 years of experience really should speak for something. And certainly the Attorney General has told us what she thinks of it. In the Burson case, if a content-based ban passed muster, wouldn't that suggest that a content-neutral ban for the same state interests should pass muster here? I don't think so, Your Honor. I think the Burson case teaches us that a ban on electioneering and permitting exit polling is not a constitutional problem. I think Burson is completely inconsistent with the New Jersey Supreme Court's analysis. They are different forms of expression. We have absolutely no debate that electioneering and the interests of preventing fraud and intimidation, which animated the court in Burson, are compelling, and we do not disagree with the ruling in Burson. But exit polling is not electioneering. Every court that has ever considered that issue has found that that is true. And the fact that the Supreme Court recognized in Burson that exit polling might actually dissuade fraud and intimidation by having others at the polls, or as the court in Blackwell said, by deterring fraud and intimidation by their very presence, tells me at least that Burson cuts for us rather than against us, Judge Amber. But you, I'm sorry, Judge Fischer. Ms. Buckley, certainly not that you had to, but why didn't you go into the New Jersey's courts and try to seek the exception that you're seeking here today and try to get the New Jersey Supreme Court to make a determination that exit polling by your six clients was appropriate? Quite frankly, Judge Fischer, I think I had my answer from the New Jersey Supreme Court. The opinion couldn't have been any more explicit on that score, even though my clients were not parties to that proceeding, and I have a suspicion the ACLU doesn't do exit polling in the form that we do and have presented to you. But it was clear to us from reading the New Jersey Supreme Court that that court had made its decision as to what the statute meant and the constitutionality of the Attorney General's directive. Certainly plaintiffs have come to federal courts since the adoption of the Federal Civil Rights Act to try to get relief from the state actors and state courts, Your Honor, and that's why we came where we did. Obviously, that's why I said you didn't need to, but I guess your answer is that you feel that New Jersey would have said that the statute was content neutral and that there should be no exception. Is that accurate? I think they did say that, Judge Fischer, just in a case we didn't happen to be a party to. If we uphold your position, am I correct that any other entity would have the right to conduct some form of exit polling in the New Jersey elections? I think they'd have to come to a federal court and ask to do that. I'm asking you if you were deciding the case. If I was deciding the case and another institution came and wanted to do exit polling and put on the kind of presentation that we have and said that they wanted to do it, and by the way, they have been doing it, Judge Sareka, because the Attorney General let other people in in 2006, before the 2006 election, and there has been no problem. The Attorney General has told us that. But to answer your question, if they came to me and I was sitting where you were and they made that showing, I would say yes, until there's some problem that the state can put its finger on. And this state has said there's no problem at all. There's nothing wrong with people coming and seeking the right to express themselves at the polls. Excuse me, Judge Sareka. No, no, sorry. But there is Supreme Court law that says that the state doesn't have to wait for the intimidation to occur, that they can act before the fact. There's, I agree with you, but it doesn't apply here because this state has let this activity go on for 20 years and this state has told us right now, flat out, that there has been no harm to the integrity of the election, to crowding, interference, to anything. So I think after having 20 years of experience, you can't do a roundabout or about face and say, but we can speculate in the future there might be. We might have expected to see if the Attorney General was correct, that in any of the 12 states that we visited before, something like this would have occurred. And I think if it had, we certainly would have heard that from Mr. Van Italy. It hasn't, it hasn't. The one case I know of is in Florida, after the exit polling decision there, others tried to seek access to the poll to get permission to gather signatures on petitions. And they were rebuffed by the Florida courts and the 11th Circuit and their claim was rejected on many grounds that would not apply to exit polling. So now in Florida, for example, you have a situation where exit polling is permitted, but the gathering of signatures on petitions is not. Sure. What about your having adequate alternative means? It seems to me that with sufficient amount of time, you could identify 40 other places in New Jersey where you could easily identify the people who have voted from 101 feet. I recognize you're not going to be able to do that in the next 24 hours, but I'm a little bit skeptical that the reasons that you give as to why you have to get within 100 feet are so definitive. May I answer that question? Yes. The first part is addressed in Mr. Lenski's affidavit. Mr. Lenski says if I were to choose my 40 places based on their physical layout, that's not going to be a very scientific poll. But that's in the record already, that pre-selecting because of their characteristics is not a scientifically valid way of selecting. But let me go to the heart of your question, Judge Sirica. The states claim that we should either find places where we really could get to people within 100 feet, or better yet, hire 10 times more exit pollers so we could ring the polling place and make sure we get everyone. What interests are being advanced now? What are they standing for? They're saying, okay, if you have 10 or 100 exit pollers at 101 feet, you'll be able to do your job. Yes, in the state's interest, whatever it may be, they haven't really told us. They haven't indeed told us what statute we're violating. Is that served by having 100 more people at the polls or 10 instead of 1 standing peacefully outside the door, as they have been for 20 years? So the notion that they can conceive of some possible way that we may be able to do exit polling by bulking up the presence at the polls seems hardly consistent with their interest. Am I correct that all that the pollsters do is to solicit whether the people who have voted are interested in participating and handing them a sheet and then there's no further communication? I mean, there may be further, but there are no questions that are being asked at that point. That's right. As a person leaves the polling place, the exit poller approaches and asks if they would be willing to fill out a questionnaire and explain that it's entirely voluntary. It also, by the way, to answer the state's claims about privacy, it's totally anonymous. The person who fills it out does not put their name down. And I think there's an example of it in the record, Your Honor. Good. Any other questions? Thank you, Justice Buckley. Thank you very much. Mr. Van Italy? Thank you. Just a couple of quick points. First of all, I really do disagree with the notion that we can decide these issues one by one or kind of plaintiff by plaintiff because I don't think it's practical to expect a parade of people to come in one after another and challenge their access based on the fact that the predecessor is already in the space. I mean, at some point, you're going to get so far down the list that the arguments are going to be overwhelming that, yeah, okay, we've left five or six in, and now a couple more are going to cause such congestion and confusion that, sorry, you're too late to the party. So, I mean, I think the New Jersey Supreme Court was right in its thinking about this. Once you've established a principle that allows one group in, if that same principle by a parody of reasoning allows other groups in, that's the harm that you should be evaluating. But I think part of what they are saying is that it appears particularly incongruous to ban non-disruptive post-voting speech in an attempt to prevent disruptive pre-voting acts. Yeah, let me respond to that. I mean, I think you asked that question before. Is there a distinction with respect to people who come to the polling place and they don't approach you as you go in, but they approach you as you go out? I mean, I would argue, I think, from logic, that at some point, if you anticipate being, I don't want to say accosted, but being approached by, let's say, multiple individuals who, in one case, want to hand you a survey form to fill out, and another case like the ACLU, you know, want to hand you a questionnaire as to whether, you know, you had a satisfactory voting experience. And then, you know, perhaps others that want to hand out literature to you on the way out. I mean, I think it gets to the point that you've got an array of people that are trying to avoid you on the way in, but you know they're going to be there on the way out, and I would suggest... Theoretically, that may be right, but the legislation here was passed with the problem in mind of people feeling uncomfortable as they entered. Primarily, they felt uncomfortable by virtue of people soliciting them to vote for a particular candidate or handing them materials, and they probably complained to their state legislators, and the state legislature did something. But here, we don't know of, at least I don't know in the record, of any complaints against exit polling by reputable organizations. Well, yes, and I, you know, and I would, I mean, as Judge Sereca pointed out, in the Supreme Court, the person makes it quite clear that legislatures are allowed to anticipate problems. They don't need a... But there, the issue was electioneering. That was, again, that was pre-voting concerns that people had with respect to the things we just talked about, handing out materials and soliciting. If you look at what happened here and what the situation was confronted by the New Jersey Supreme Court, admittedly, you had traditional exit polling by media organizations for a number of years, and then it began to become clear to other groups, the ACLU, the Asian American Defense Fund, that there was no legitimate basis to exclude them talking to exit pollsters, I mean, talking to exiting voters if you're going to allow exit pollsters. So they came in. Then they made the point, hey, the exit pollsters are handing out, they're handing out literature, they're handing out a questionnaire within that 100-foot zone. I want a handout. As preceded, would you be willing to participate in an exit poll, right? That's what it said, but then it's got a lot of information, socioeconomic, demographic, et cetera. But, I mean, I think, again, how do you distinguish? How can you reasonably distinguish between that voting questionnaire and a piece of literature about your voting experience? And that's the problem that we're working with. And I think it doesn't make sense to do this one-on, what the district court did in carving an exception, okay, for not just these individual plaintiffs, but for these individual plaintiffs with respect to a plan, kind of limited impact plan that only hit 40 locations with one pollster each. That's just wrong. I mean, that is the most content discriminatory kind of pronouncement possible. I mean, it is unsustainable that this group can come in and others can't. And that's the harm that's going to be caused. I mean, that may be a good argument to the district court. It leads to my question, is if we were to affirm the grant of the stay by the judge here and tomorrow's election goes forward, what happens next in the district court? If we were to deny the stay. Deny the stay, yes. Well, I mean, Dave, this is a complaint, preliminary injunction. We answer the complaint, we go forward. So, you know, traditional litigation, I mean, we get to the merits ultimately. Again, I mean, we're vindicating, you know, we've got a flat conflict between a federal district court, we regard on a clearly erroneous legal principle against the highest court of the state of New Jersey, unanimous opinion with the chief judge who was the prior edge. He didn't participate, otherwise unanimous. I mean, we are vindicating what is a flat-out conflict, state-federal conflict that is unnecessary to be perpetuated because you've got, you know, with respect, a district judge that asked the wrong question. He asked a question directed to plaintiffs, and that's not the question. The question is, is this legislature of the state of New Jersey permitted to establish this broad ban, keeping not just plaintiffs out, but the whole class of people that want to intrude upon this, you know, sacred ground of the voting place. So, yeah, I mean, you know, that's, you know, you asked the question about the Burson case. I mean, the New Jersey Supreme Court case, the New Jersey Supreme Court came to the conclusion that if Burson, it's Judge Ambro, you know, if Burson, you know, content discriminatory, 100-foot zone, the most privileged protected kind of First Amendment speech, you know, campaign speech about the government during an election season, nothing is more sacred. If you can ban that with content discriminatory statute, 100-foot, you know, this is a fortiori. I mean, we are states espousing the same principle. Our statute is, you know, absolutely content neutral. I think we, any other questions? Good. Thank you, Mr. VanItaly. Thank you very much. As we all argued, we will issue, certainly issue a decision today, and you will be notified as soon as possible. Thank counsel very much. Take the matter under advisement.